Good morning, Your Honor. May it please the Court. The District Court's central error in this case was not recognizing that the claimed invention was extraordinarily obvious. If the claims ensued are properly construed, there's only one real difference between a product that APC was already marketing, the MSVM, as a plug strip for server racks, and the claimed invention. And that difference was not using a series of colored lights to show you how much current was flowing, but instead to use a digital display to show you the volume of current going through the plug strip. But that idea had already been demonstrated and existed in the prior art in the Lee and Liu patents, which preceded all of what happened here. And those patents explained that you can put a digital display on a plug strip, it shows you how much current is flowing, and it serves the purpose, solves the problem of current overloads. And so what you have here is a classic example of combining prior art in a way that the features of the prior art serve the exact function that you would expect them to, in the exact way that you would expect them to. It's a classic kind of KSR problem. And that's exactly, by the way, what the PTAB found in their recent decision looking at this exact issue. Could we talk a bit about the claim construction issue here? Because Apley comes close to admitting that the jury was incorrectly charged with respect to the plug strip limitation in the 543 patent and the statement that everything had to be in the plug strip itself. And so they argued that as to the 771 patent, there wasn't any such instruction and that the jury verdict with respect to the 771 can be sustained on the obviousness issue because there was no such requirement imposed. So what's your answer to that? Your Honor, as the case was presented to the jury, they were told over and over again that the patents were identical with respect to the one-piece requirement, that they both had one, that there was no difference. That was the argument that STI made in the trial court consistently from the beginning, before trial, during trial, after trial. But the court didn't instruct the jury that there was such a requirement with respect to the 771. Well, that's true, Your Honor, but no party in the courtroom ever suggested it didn't have a one-piece requirement. That was, in fact, what the jury was told over and over again with this demonstrative, referring to page 7 of our brief, that the essence of the invention included four key elements. One was a vertical one-piece, and there was never a differentiation made by STI because that wasn't their position at the time between the 543 and the 771. And so there is no reason whatever to think on the actual facts of this case that it ever occurred to the jury that the 771 lacked a one-piece requirement. That's just the way the case was presented to them. Indeed, STI was still arguing that in the post-trial briefing. So for them to come into the court here and say the jury probably figured out by itself that there was a difference between a device and a plug strip, and one was a two-piece or could be a two-piece and the other one couldn't, simply blinks reality in terms of how this case was actually argued. It was a clever way for them to kind of come up and maybe find a harmless error argument on appeal. But it's not what the jury understood or could possibly have understood. And the fact that the 771 doesn't mean that the jury had any doubt about what they thought that the patents meant, and indeed what the court held it meant during the trial, and prevented us from making any argument about it not having a one-piece requirement. That claim construction is clearly erroneous. I mean, if you look at the actual language of either patent, there is no basis at all for it. Suppose we were to agree with you that the claim construction is erroneous. What does that do to the finding of, let's say, infringement, or obviousness and then infringement? Well, with respect to obviousness, it clearly undercuts the jury's findings with respect to the secondary considerations of obviousness, because they're looking at the wrong thing. They're looking at a different invention. They have different things that would have to be combined from the prior art. If you had a one-piece requirement, there's a third piece of prior art you'd have to bring in. So they were analyzing motivation to combine commercial success. All of these things would be very substantially undercut, I submit, by them misunderstanding the scope of the invention in a very important way. A lot of what the evidence showed was that customers liked the one-piece configuration of the actual product that STI was selling, and that was a feature that was touted by them. But that's not relevant to the secondary considerations if that's not a feature of the patent. And since it's not, I think that very strongly undercuts the secondary considerations and certainly entitles us to at least a new trial. But the reality is once you take that requirement out of the patent and out of the invention, you just have slapping the digital display on existing technology. And putting a digital display in a plug strip had already been done in the prior art. And so I don't think this is a case where we need to go back and have another trial on the obviousness of that invention. Now, what they say is, well, we were doing it for a different reason. We were solving a different problem. We weren't just solving the current overload problem. We were solving the problem of inefficient rack utilization, basically saying you could use this digital display to get as many servers on your rack as possible before you get an overload. Whether that's really a different problem or a different side of the same coin, I'm not sure. But it doesn't matter whether you're, you don't just focus on the problem that the inventor was looking at. Any problem that's a known problem that could provide a motivation to combine can get you an obviousness determination. And so the, I guess I didn't answer it, by the way, the second half of your question, Judge Ray. And I don't think that the one piece thing is really relevant to the infringement issue. The infringement issue comes up for the 7900 product line because that, and that goes to the issue of whether or not just display, just communicating current information is sufficient to satisfy the requirement of communicating power information. And we say it's not because power information has to basically be communicating watts, not amps. And the 7900 series only could detect and measure and communicate amps, not watts. And so that is the central infringement issue. If you get to that, I don't think you have the obviousness being fairly obvious. Not to make a silly joke. So they basically have two responses to the obviousness. One is it's a separate problem we were looking at, which isn't an answer as a matter of law under KSR. And even if you just focus on their problem, which is having the ability to efficiently utilize the racks by putting as many servers as you can before you get to the limit. I mean, I think your problem on the J-Mall issue is that you've got all these findings about secondary considerations by the jury. And I guess what you're arguing is that even if there are secondary considerations here, that the prima facie case of obviousness outweighs them. Absolutely, Your Honor. I don't think there's, this is a classic case of that, just as in the Apple case earlier this year, or the ABT case last year. I mean, you have, you look at where the prior art was, you look at how much difference they made in the prior art, how much innovation was there. Was there some technological innovation or some sort of surprising technological outcome here? And there's none of that. And so you have these secondary consideration findings, but they are then, you know, they're weak for a variety of reasons. One is they're tainted by the fact that the jury misunderstood what the invention was because of this one piece discussion we had before. And there's a very thin evidence of nexus to what was the actual invention, which is the digital display. They just basically said there's lots of commercial success of this product because of all of its features, that everybody liked all their features. And that was kind of the evidence that was put in. This is occurring at a time when the Internet is, like, exploding tenfold. And so lots and lots of these server farms are being built. There's an awful lot of sales of plug strips, some plug strips that meet these requirements, plug strips that don't meet these requirements. There is a huge growth in the marketplaces. So for a whole variety of reasons, I think these findings by the jury ought to be the least of the problem here. The obviousness is so glaring once you understand what they did, which is to take the Li and Liu patent, which says you avoid overloads by putting a digital display, you slap it on your plug strip, and they did that to a server plug strip as opposed to the smaller plug strips, which were at the same level. That, by itself, can't be a sufficiently inventive change in the technology to avoid an obviousness problem. I suppose all these arguments were made at the trial, weren't they? Certainly, Your Honor. And in all of the cases in which... And the jury heard all this? Absolutely. They heard lots and lots of evidence about this, Your Honor. And sometimes juries make mistakes about these kinds of things, and sometimes obviousness has to be overturned in this court. That's what happened in ABT. That's what happened in the Apple case. And I don't see an argument that can be made that there was an invention here that warrants patent protection. They had a product that sold, but what the technological invention was that had not been done before is very hard to identify, I would submit, especially when you leave out the one-piece thing. I mean, it's simply slapping the digital display on the existing technology that we were already selling in the marketplace. If I might just quickly address, then, the infringement issue. The argument there is that even though the patent requires communication of power information and the 7900 only communicated current information, that's still close enough. And what's interesting about this is the court adopted a construction of the term power information, which is the construction that they like to rely on on appeal here, which is quantifying or describing power. At the time it did that, recognized that this definition, this construction of the term would preclude arguing that current information is the same thing as power information. That's on page 3436 of the joint appendix. That was at the Markman stage. And so for some reason later on the district court sort of forgot that it had come to that conclusion and allowed them to argue literal infringement by the 7900, even though the 7900 only communicates amps, not watts, and the requirement of power information being communicated in Claim 15 is specifically different from the Claim 1 in each of the patents, which just simply requires them to communicate current information. So they had a reason for putting power information in there, but they were still arguing that it really didn't make any difference, that somehow current and power are the same thing. And then they make a doctrine of equivalence argument which doesn't explain why it is that they can avoid the prosecution history estoppel here. They put this requirement in during the prosecution. They don't have a theory under FESTO to explain why it would be sufficiently tangential to avoid an estoppel. And so I think ultimately they have a serious problem on their infringement claim as to the 7900, not as to the 8900 product. You have to draw a distinction between those two. If I might reserve the balance if I time you. Okay. Thank you. Thank you. Mr. Hartley? Thank you very much. Excuse me. We all have allergies this time of year, Mr. Hartley. Boy, do we. So do you think the one-piece claim construction was correct as to the 553 patent? Yes, I do. And I'm sorry if we said something in our brief that gave you a different impression. However, what I want to talk about this morning is that it doesn't really matter. No, but I would like you to talk about that. What's that? Just what I asked you about. I'm happy to talk about it, but there... I think it's important. So my original statement was correct when I said you really don't want to talk about it. The reason is it doesn't matter because the facts support the jury's findings. No, but before we get to does it matter, let's talk about whether it was right. Yes, sir. How can it be that the one-piece construction was correct? Several reasons. First of all, I think the term plug strip was effectively a term of art. They used the term plug strip to refer to Lee and Lew. It's never used there. It's not used anywhere. In this case, we have the preamble to the claim that talks about a plug strip comprising elements A through F. And then it proceeds in the claims to use in element F the term plug strip itself. So we have adequate basis both for essential structure and the use of the claim for the preamble to be limiting. That's the starting point. Then the question is what does plug strip mean? The specification could not be more clear. Throughout, it refers to it as a one-piece device. Even, for example, in their argument about a separate chassis that they make, that refers to a separate chassis separate from the one-piece plug strip. If you look at figure one, it shows it as a one-piece device. But the language of the claim is a plug strip current reporting system associated with the vertical strip enclosure. Absolutely. But isn't associated with cut against the idea that it's one piece? Well, certainly it can be read that way. And I understand the court's question. The general term associated with it has no clear meaning. It is a broad, broad term, of course. In order to understand its meaning in the context of this patent and these claims, I think you need to look at the context in which it is used in the patent. The context is critical. The reason I say that is that... Well, is there any statement in the specification that it has to be one piece? There is, I think, descriptions of the plug strip. But not a flat statement that says the plug strip has to be one piece. Okay, well, I don't want to use all your time on this. Let's suppose that we were to conclude that you were wrong about the claim construction with respect to the 543. And let's assume that the court imposed, as I think it did, the same one-piece claim construction to the 771. So why isn't that at least a ground for a new trial here? Several reasons. First of all, let me take your second comment first. The court never, in the presence of the jury, expressed the view... Well, not in the presence of the jury. But it did, during the trial, say that that same one-piece construction applies to the 771 at a sidebar conference, right? That's correct. But the jury was never instructed. It was simply the point I was going to make. APC never sought an instruction that would have permitted the two-piece analysis. We argued... You can't have error without an instruction? You certainly can. But I was just trying to suggest that I don't think the court ever... The court absolutely did not exclude any evidence based on this one- or two-piece construction. But let's get to the key point, that it is that it doesn't matter. And let me try to explain why. You know from the briefs that we made two very important fact-based arguments, reason to combine and secondary considerations. With respect to the reason to combine, and I should say that in both instances, neither... Wait a second. But surely if the jury was told that there's a one-piece requirement, let's say, turning to your closing argument, and that was mistaken, that's error. Well, why isn't that error? I don't think it is error for us to argue that it was a one-piece requirement, just as it would not have been error for them to argue that it was two-piece. Because the court never construed the term. There was a single passing reference. Well, I don't see how they could argue that it was two-piece when the court had ruled that it had to be one. The court had not specifically made that ruling, Judge Dyke. The court, in a passing sidebar, outside the presence of the jury, permit our expert to continue to testify according to our theory of the case, which we maintain through this appeal. But he did not ever exclude from their argument or presentation of evidence anything that would have kept them from making the two-piece argument. But he's already ruled in summary judgment what the claim construction is. Then he does it again during the trial at the sidebar. Why can't they accept that and say, well, we can't argue it's two-piece? His ruling in summary judgment was based entirely, if you look closely at his order, on his analysis of the 543 patent and the term plug strip. So I think they made a mountain out of a couple of passing references. And I can – excuse me, Judge Clayton. Go ahead. And I can assure you that this was not something that was clear at the trial. The sidebar is pretty clear. It's explicit. In the sidebar, what he is saying is that he is permitting our expert to continue to testify, Judge Dyke. That's right. Did he change his mind, the judge, on that issue? Or it seems to me the judge's position is inconsistent. On the one hand, he says it's single, but go ahead and argue the other side. He did not, in candor, he never said go ahead and argue the other side. He allowed us to put in our evidence that the term device was a one-piece unit. He did not then go further, and I'm sorry if I misled you, Your Honor. He did not go further and say you may – you, APC, may put in the two-piece evidence. And they didn't? They did not because they were focused on the one-piece plug strip and the 543 pattern. That was the entire focus of the trial, Judge Dyke. That was all anybody was paying any attention to, which is why I want to come back. The problem is your expert testified that it was non-obvious because of the one-piece requirement, and that argument was made in the closing argument, right? That's correct. And what I would like to do is make the points I started with, and that is that – Well, yeah, why don't you do that? But let's assume hypothetically that we were to disagree with you. We find that there is no one-piece requirement in either patent and that the argument of the jury was error in that respect. So why don't we have to, under those circumstances, reverse and remand for a new trial? Because under this Court's precedent, if the findings of the jury are otherwise supported by evidence that is not dependent upon that interpretation, you may affirm. I don't think that's the right standard. I think that if there's an error in the trial, which could have led the jury to rely on the one-piece requirement, that we have to send it back. What case says that we don't have to send it back? The case that I am referring to, Your Honor, is the Function Media case that talks about errors in claim construction that do not necessarily lead to reversal and can lead to affirmance if there is otherwise support for the jury's verdict. That's it, 708F3rd. I don't know what that case says, but that is not the correct standard. You can't have an error in the trial and say, well, we don't have to pay attention to it because there was other evidence that would support the jury's verdict. You can say it's harmless error if the rest of the evidence compels the result, but not that it permits it. I think you've stated it better than I did, and I apologize. I think you're correct. Let me show you why I believe that the evidence compels the conclusion that there was harmless error. First of all, APC offers three interrelated reasons to combine. None of them is supported by the evidence. The jury's findings on that order, the implicit findings in that regard, are fully supported. Let me just quickly tick off some of the important evidence so you will see it has nothing to do with one-piece construction or two-piece construction. First of all, the industry participants, APC itself, a competitor to BATEC, thought of but rejected the idea of a combination such as this one because they didn't see a benefit in doing so. The industry leader, called Exodus, did not see a benefit. The evidence is clear. And even APC's expert, a Dr. Horenstein, asked if there was any market demand or need to modify the prior art PDUs to include a digital display. He answered, I guess the answer is no. And that's in the red brief or in the appendix at A25539. Another independent data center operator, Mr. Brown, made similar testimony. Another gentleman, Mr. Mayers, did. The bottom line is the evidence fully supports the point that no one in the industry saw a benefit in this combination. It has nothing to do with one-piece or two-piece. Second, APC relies on the so-called overload problem. And that relates primarily to the Lee and Liu patents. You have to understand what the overload problem was all about. They dramatically exaggerate what it meant. Every single piece of prior art that addressed overload did so with an alarm or a buzzer because that's what was necessary to call the technician's attention to a single unit out of literally tens of thousands that may be defective or have problems. So the overload problem was an alarm-related issue. And if you read Lee and Liu carefully, you'll see exactly that. The display wasn't there to address overload. They had a buzzer in both of them, and we put that in our brief. It's very clear from the Lee and Liu patents. Finally, the Liu patent alone does not provide a reason to combine. And perhaps if you think a little bit about a data center, you'll understand why. A data center is not simply taking your home plug strip and putting it vertically on a rack. The data center PDUs, as you know from the art in this patent, have current reporting systems. They have switch systems and all sorts of elaborate computer-controlled internal components. Just because somebody thought it was a good idea to put a digital display on a little power strip says nothing about whether that would make sense in the data center. The data center PDUs, plug strips, already had current reporting. They did it remotely. To add another display, as Lee and Liu would suggest, to monitor current, is duplicative. It's costly. It's unnecessary. It caught against, if you will. It was counterintuitive to use that same display. I don't want to run out of time before you address the infringement question with respect to the 7900 series and the fact that they just displayed current rather than power. Let me do that first, and if I have time, I'll come back to these others. The infringement issue is, I think, there are two basic points to be made. First of all, I think APC is incorrect when they say the judge previously had ruled on this question. Well, put that aside. Okay? I mean, current and power are different. Absolutely. And their 7900 series only displays current. As I understand, what your argument is that people knew the voltage so they could have calculated the power. And that seems to me a bit far-fetched in the sense that the idea here is to have a display which can be read without making calculations. That actually is the equivalence argument. Let me talk about the literal infringement argument, if I may. The key to the literal infringement argument is an understanding of the definition, the construction, of the term power information. And basically, it's information sufficient to quantify or describe. What the patent does is it talks, or excuse me, what the 7900 does is that it conveys information sufficient to describe power because it communicates current, that current is flowing to the PDU, and that there is a voltage present at individual outputs. Yeah, but that's the exact argument I was asking about a moment ago, which you characterized as an equivalence argument. This is the literal infringement argument. And the problem is what you're saying is that they had enough information to make a calculation. It seems to me hard to read the patent as saying giving people enough information to make a calculation satisfies the claim limitation. It would seem to me that it would have to be something that would display the information so that you could read it immediately. Well, with respect, Judge Dyke, I think I have not been clear, perhaps in our briefing, and I apologize. The key to the literal infringement argument is the communication of whether or not an outlet is on or off. That describes power. Whether there is power to the outlet, whether it is on or off, not the amount. We're not quantifying. It describes power or voltage? It describes power because the only way you know you have power, it communicates whether the outlet is on or off. In our brief, we show the graphic used by the expert. It says outlet 1, 2, 3, 4, on, off, on, on, off, off, whatever. The way the unit knows that is that it knows current is flowing to the PDU. You're saying that all it requires is whether it's on or off? To describe power, yes. The description of whether an outlet is on or off. Did you make that argument in your brief? I don't recall it. Yes, it's there. It's under literal infringement. Where? Excuse me, where? Where? It is beginning at page 67. Well, where exactly? It is exactly at page 67 where it begins, and then on page 69 is the graphic I was talking about that shows the... Yes, but where does it say that all it requires is to know whether it's on or off? Oh, I'm sorry. I don't recall it. The point we are making is that, and I guess I would say it is at best seen on pages 69 and 70, is that the description of power includes whether an outlet is on or off. It describes power to know that an outlet is hot. Well, that's because there's voltage. I mean, whether it's on or not doesn't tell you the power, the capacity. Isn't power a function of current times voltage? Yes. That's power, current times voltage. What is communicated in the 7900 products is the presence of voltage at a unit, which it does determine that there is voltage present, and that current is flowing. Those two pieces of information taken together can be used to describe power, not quantify. I acknowledge that. But they can be used to describe. And this is very important and relevant information because if there is a fault with a unit and the outlet is shown to be on, then it is likely the server is the problem. If the outlet is shown to be off, then it's probably a problem perhaps with the PDU, or they switch it back on. So the bottom line is we believe that the description of power includes that information. Okay. Mr. Harley, we're out of time. Thank you very much. Thank you, Your Honor. Mr. Smith, you've got a little bit of time left here. Your Honor, just a couple of quick things first on the one-piece issue. I think it's important to recognize if you think that maybe the jury had any differentiation between these two patents, not only was it argued that they were the same by STI and effectively by us too because we had no choice given the court's rulings, but the jury verdict form on the obviousness secondary considerations was a single form applicable to both patents. So they weren't asked to assess those separately with respect to the two of them because nobody ever suggested to the jury that there was any difference between the two with respect to the one-piece issue. With respect to the question of whether or not the specification narrows the meaning of associated with in the definition in the discussion of the current reporting system that you were mentioning, Judge Dike, in fact what the specification does is say that a one-piece configuration is a preferred embodiment, is preferably the right way, but it also explains that other embodiments do not have a one-piece configuration. So there's absolutely nothing I submit in the specification that would lead you to take the word associated with, which is quite different from the words of the other five elements where it says disposed on, disposed with, disposed in, and then this element you get associated with because there were in fact power strips that had the current reporting system connected by a cable. The MSVM was one. And so they clearly voted broadly enough to cover that and are now trying to rewrite that part of their patent. The motive to combine the Lee and Liu patents teach that the way to solve the current overloads is to have this digital measurement device and then set it to shut off or set an alarm or do something at a certain number so that it doesn't get to the real overload. And that's exactly the reason to combine. And why you would have a digital measurement is to be able to have this more granular measure and then be able to set the thing to operate at a certain level when it reaches that point. That's the Lee and Liu reason to combine, which is already in the prior art, taught in the patents very expressly. I commend you to read Lee and Liu. They're very short patents, and they tell you why it is you would put a digital display on a plug strip. The other reason to combine comes from the problem they say they were solving, which is they say the problem was these server racks were only being filled up to one-third of their capacity because the engineers were overly cautious. They didn't have good enough information about how close they were to an overload on any given rack, and so they would only put three servers on there instead of maybe five if they had better information. They identified that as one of the problems. Right. And that problem would properly describe the problem of inefficient rack utilization because the only solution that you can imagine to that problem is to give the people better information about how close to an overload they were. How do you do that? With a digital display of how much current is flowing. And so I think even as to the problem they say they were solving, it's equally obvious, Your Honor, and that there's a reason to combine and you would get to the same solution. Or equally inventive, depending upon your viewpoint. Well, I think at the end of the day, you guys have to judge whether that's inventive or whether that's simply common sense that anybody would arrive at if they focused on that problem. Okay. Thank you, Mr. Smith. Thank you, Mr. Hartley. Case is submitted. That concludes our session for today. All rise.